# EXHIBIT X

# Estate of Cornell Horne

# VCF Documentation



September 11th
Victim Compensation Fund

September 20, 2017

ELIZABETH HORNE
68 E. BROAD STREET
BERGENFIELD NJ  07621

Dear ELIZABETH HORNE:

The September 11th Victim Compensation Fund ("VCF") has reviewed your Eligibility Form. You submitted an Eligibility Form on behalf of CORNELL HORNE.  Your claim number is VCF0092085.  Your Eligibility Form was determined to be substantially complete on September 19, 2017.  As stated in the Regulations and on the claim form, by filing a substantially complete Eligibility Form, you have waived your right to file or be a party to a September 11th-related lawsuit on behalf of the decedent and his or her survivors.

**The Decision on your Claim**

The VCF has determined that the decedent has met the eligibility criteria established in the statute and regulations.  Based on the information you submitted and information the VCF has received from the World Trade Center ("WTC") Health Program, the decedent has been found eligible for the following injuries:

- MALIGNANT NEOPLASM OF PANCREAS PART UNSPECIFIED

Please note that there are several reasons why an injury that you think should be eligible is not listed above.  For non-traumatic injuries, the name of the injury is based on the information provided by the WTC Health Program and there may be different names for the same injury. Additionally, your injury may not be listed if it was only recently certified for treatment by the WTC Health Program.

If in the future the WTC Health Program should notify you that a condition previously found eligible is no longer certified, you must inform the VCF as this may affect your eligibility status and/or the amount of your award.

**What Happens Next**

**If the decedent was certified for treatment by the WTC Health Program for a condition not listed above**, you should amend your claim.  Please see the VCF website for details on how to amend your claim.  The VCF will review the new information and determine if it provides the basis for a revised decision.

**If you believe the decedent had eligible injuries not treated by the WTC Health Program** and you would like the VCF to consider those injuries before calculating the amount of any compensation, you should amend your claim.  If you choose to amend your claim, you will need to use the VCF Private Physician process.  The Private Physician process is a way for the VCF



September 11th
Victim Compensation Fund

to gather the required information about the decedent's treatment in order to process your claim. All forms are available on the VCF website under "Forms and Resources." The website also includes detailed information and instructions on the Private Physician process.

**If the decedent did not have injuries other than those listed above,** you should submit your Compensation Form and required supporting materials. If you have already submitted your Compensation Form, you do not need to take any action at this time unless you receive a request from the VCF for missing information. The VCF will calculate the amount of any compensation based on the conditions listed above after all compensation-related documents are submitted.

If you have questions about the information in this letter or the claims process in general, please call our toll-free Helpline at 1-855-885-1555. For the hearing impaired, please call 1-855-885-1558 (TDD). If you are calling from outside the United States, please call 1-202-514-1100.

Sincerely,

Rupa Bhattacharyya
Special Master
September 11th Victim Compensation Fund

cc: WENDELL TONG



September 11th
Victim Compensation Fund

October 24, 2019


ELIZABETH HORNE
1162 E LAURELTON PKWY
TEANECK NJ  07666


Dear ELIZABETH HORNE:

The September 11th Victim Compensation Fund ("VCF") sent you a letter on June 28, 2018 notifying you of the decision on your claim and the amount of your award.  Your claim number is VCF0092085.  That letter included a request for documents that were missing from your claim and are required in order to process your payment.  The VCF has since received the requested documents and this letter provides the details of your award and information on the next steps to be taken on your claim.

Based on the information you submitted, the VCF has calculated the amount of your award as **$193,400.00**.  This determination is in accordance with the requirements of the VCF Permanent Authorization Act.  The enclosed "Award Detail" includes a detailed explanation of the calculation and a list of the eligible conditions included in this determination.

Lost earnings prior to your husband's death were not awarded, as he had not been found disabled by a government entity prior to his passing.  Future lost earnings were not awarded because your husband had passed the age at which the VCF assumes that worklife ends and because your husband was not working and was already receiving retirement benefits from the Social Security Administration.  The award includes non-economic losses attributed to personal injury prior to your husband's death and the non-economic losses associated with the wrongful death claim, as well as reimbursement for burial expenses.  As shown in the detailed breakdown of the award, the collateral offsets applicable to the wrongful death losses were not applied to the personal injury award.  If you have additional information that would change the award, please see the section below for more information on how to amend your claim.

No non-routine legal service expenses are approved for reimbursement for this claim.

As the Personal Representative, you are required to distribute any payment received from the VCF on behalf of the victim to the eligible survivors or other recipients in accordance with the applicable state law or any applicable ruling made by a court of competent jurisdiction or as provided by the Special Master.

## What Happens Next

The VCF will deem this award to be final and will begin processing the payment on your claim unless you complete and return the enclosed Compensation Appeal Request Form within **30 days from the date of this letter** as explained below.  If you do not appeal, the Special Master will authorize the payment on your claim within 20 days of the end of the 30-day appeal period.  Once the Special Master has authorized the payment, it may take up to three weeks for the United States Treasury to disburse the money into the bank account



September 11th
Victim Compensation Fund

designated on the VCF ACH Payment Information Form or other payment authorization document you submitted to the VCF.

- **Appealing the Award**:  You may request a hearing before the Special Master or her designee if you believe the amount of your award was erroneously calculated or if you believe you can demonstrate extraordinary circumstances indicating that the award does not adequately address your claim.  **If you choose to appeal, your payment will not be processed until your appeal has been decided**.

  To request a hearing, you must complete and return the enclosed Compensation Appeal Request Form **and** Pre-Hearing Questionnaire no later than **30 calendar days** from the date of this letter.  The VCF will notify you in writing of your scheduled hearing date and time and will provide additional instructions to prepare for your hearing.  If both forms are not submitted with complete information within 30 days, you have waived your right to appeal and we will begin processing your payment.

- **Amending your Claim**: You may amend your claim in the future if your circumstances change and you have new information to provide to the VCF that you believe warrants additional compensation.  The VCF website has important information about the specific circumstances when it is appropriate to request an amendment.  For more information and examples of such situations, please refer to "Section 5 – Amendments" in the VCF Policies and Procedures document available under "Forms and Resources" on the VCF website.  Please review the information carefully when deciding whether to amend your claim.  If you submit an amendment, the VCF will review the new information and determine if it provides the basis for a revised decision.

- **Notifying the VCF of new Collateral Source Payments**: You must inform the VCF of any new collateral source payments you receive, or become entitled to receive, such as a change to your disability or survivor benefits, as this may change the amount of your award.  If you notify the VCF within 90 days of learning of the new collateral source payment, your award will not be adjusted to reflect the new entitlement or payment.  If you notify the VCF more than 90 days after learning of the new or revised entitlement or payment, the VCF may adjust your award to reflect the new payment as an offset, which may result in a lower award.  If you need to notify the VCF of a new collateral source payment, please complete the "Collateral Offset Update Form" found under "Forms and Resources" on the www.vcf.gov website.

Your award was calculated using our published regulations, and I believe it is fair and reasonable under the requirements of the VCF Permanent Authorization Act.  As always, I emphasize that no amount of money can alleviate the losses suffered on September 11, 2001.

If you have any questions, please call our toll-free Helpline at 1-855-885-1555.  For the hearing impaired, please call 1-855-885-1558 (TDD).  If you are calling from outside the United States, please call 1-202-514-1100.



September 11th
Victim Compensation Fund

Sincerely,

Rupa Bhattacharyya
Special Master
September 11th Victim Compensation Fund

cc: WENDELL TONG



September 11th
Victim Compensation Fund

# Award Detail

Claim Number:  VCF0092085
Decedent Name:  CORNELL HORNE

| PERSONAL INJURY CLAIM (Losses up to Date of Death) | |
|---|---|
| **Lost Earnings and Benefits** | |
| Loss of Earnings including Benefits and Pension | $0.00 |
| Mitigating or Residual Earnings | $0.00 |
| **Total Lost Earnings and Benefits** | $0.00 |
| | |
| **Offsets Applicable to Lost Earnings and Benefits** | |
| Disability Pension | $0.00 |
| Social Security Disability Benefits | $0.00 |
| Workers Compensation Disability Benefits | $0.00 |
| Disability Insurance | $0.00 |
| Other Offsets related to Earnings | $0.00 |
| **Total Offsets Applicable to Lost Earnings** | $0.00 |
| | |
| **Total Lost Earnings and Benefits Awarded** | $0.00 |
| | |
| **Other Economic Losses** | |
| Medical Expense Loss | $0.00 |
| Replacement Services | $0.00 |
| **Total Other Economic Losses** | $0.00 |
| | |
| **Total Economic Loss** | $0.00 |
| | |
| **Total Non-Economic Loss** | $250,000.00 |
| | |
| **Subtotal Award for Personal Injury Claim** | $250,000.00 |



September 11th
Victim Compensation Fund

| DECEASED CLAIM (Losses from Date of Death) | |
|---|---|
| **Loss of Earnings including Benefits and Pension** | |
| | |
| **Offsets Applicable to Lost Earnings and Benefits** | |
| Survivor Pension | |
| SSA Survivor Benefits | |
| Worker's Compensation Death Benefits | |
| Other Offsets related to Earnings | |
| **Total Offsets Applicable to Loss of Earnings and Benefits** | $0.00 |
| | |
| **Total Lost Earnings and Benefits Awarded** | $0.00 |
| | |
| **Other Economic Losses** | |
| Replacement Services | $0.00 |
| Burial Costs | $3,965.00 |
| **Total Other Economic Losses** | $3,965.00 |
| | |
| **Total Economic Loss** | $3,965.00 |
| | |
| **Non-Economic Loss** | |
| Non-Economic Loss - Decedent | $250,000.00 |
| Non-Economic Loss - Spouse/Dependent(s) | $100,000.00 |
| **Total Non-Economic Loss** | $350,000.00 |
| | |
| **Additional Offsets** | |
| Social Security Death Benefits | ($255.00) |
| Life Insurance | ($71,000.00) |
| Other Offsets | $0.00 |
| **Total Additional Offsets** | ($71,255.00) |
| | |
| **Subtotal Award for Deceased Claim** | $282,710.00 |



September 11th
Victim Compensation Fund

| Subtotal of Personal Injury and Deceased Claims | $532,710.00 |
|---|---|
| PSOB Offset | ($339,310.00) |
| Prior Lawsuit Settlement Offset | $0.00 |
| **TOTAL AWARD** | $193,400.00 |
| | |
| **Factors Underlying Economic Loss Calculation** | |
| Annual Earnings Basis (without benefits) | |
| Percentage of Disability attributed to Eligible Conditions - applicable to Personal Injury losses | |
| Start Date of Loss of Earnings Due to Disability - applicable to Personal Injury losses | |

| Eligible Conditions Considered in Award |
|---|
| Malignant Neoplasm of Pancreas Part Unspecified |

# Family Member Affidavits

# Elizabeth Horne

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
In Re:

TERRORIST ATTACKS ON                          03-MDL-1570 (GBD)(SN)
SEPTEMBER 11, 2001

------------------------------------------------------------X        **AFFIDAVIT OF ELIZABETH**
RAYMOND ALEXANDER, et al.,                              **HORNE**


                                    Plaintiffs,        21-CV-03505 (GBD)(SN)


                    V.

ISLAMIC REPUBLIC OF IRAN,

                                    Defendant.
------------------------------------------------------------ X

STATE OF NEW JERSEY        )
                                        : SS
COUNTY OF BERGEN          )


        ELIZABETH HORNE, being duly sworn, deposes and says:

        1.      I am a plaintiff in the within action, am over 18 years of age, and reside at 1162 East Laurelton Parkway, Teaneck, New Jersey, 07666.

        2.      I am currently 64 years old, having been born on November 1, 1958.

        3.      I am the wife of Decedent, Cornell Horne upon whose death my claims are based. I submit this Affidavit in support of the present motion for a default money judgment for the claim made on behalf of my husband's estate and for my solatium claim. On December 18, 2015, I was issued Letters of Limited Administration as Administrator of my husband's estate by the Queens County Surrogate's Court.

        4.      My husband passed away from pancreatic carcinoma on October 5, 2014, at the age of 66. It was medically determined that this illness was causally connected to his exposure to the toxins resulting from the September 11, 2001, terrorist attacks at the World Trade Center.

5.      Cornell was my husband and a New York City fireman. He loved his job and talked about it often when I first met him. Even throughout our relationship, he kept his love for the fire department alive.  As such they enjoyed camping trips, holidays parties and all the activities they organized. Outside of the department, he enjoyed fishing. He and his friends would rent a boat and travel close to Cuba and fish all day. They sent so much fish home that some had to be given away. Sports were his love, and he volunteered to be of help for his son's football team. He was the kind of person who annoyingly called everyone by their first name. I used to argue about that since they never told him the names, he just found out and used it. I got used to it over time. Our relationship wasn't a normal one. We broke up many, many, many times. As good as he was to family and friends, we had issues. Each break up gave him cause to evaluate himself and he changed what it was that caused our problem. One of the things that stands out from our relationship was he was a positive and patient person. Even at work, he was positive. I learned much later that his laughter and smile were genuine most of the time but also, he smiled a lot when he was uncomfortable. It was a defense mechanism at times. That made me sad for him because I knew what it was about.  His ability to be patient even under the most trying circumstances, even for me and a lot of other people, is what I remember most. I could never be that way, but it was natural for him. I think of it often and wish I had some of that ability. For him it was natural, not learned. Unbelievably, our most memorable times were when he got sick. I truly believed he would get better after surgery, and he wasn't eating much. I screamed and immediately apologized to him, feeling absolutely like a beast. He said, "No don't apologize. I like it when you yell at me.  It makes me feel like I'm going to live. Just be yourself because everyone is acting like I'm dead." I cried as I sat next to him and talked while he tried to drink the stuff. When he was laying down, I would bring the picture box and we would look at every

one of them. We would laugh and make jokes about the kids and fall asleep. That was the most intimate time we ever had together.

6.     The morning of 9/11 I was getting ready for work. Cornell called me into the living room to show me that a plane had crashed into one of the towers. Shocked, I watched while he talked. He repeatedly said it was an act of terror because how could a plane ever get close enough to do that. He said he was getting ready to go because they would all be called in. Sure enough, he did leave. At work I was scared because he was there but kept it to myself. Others that knew he was a fireman asked about him, but I simply responded that he went already. He called me several times, but I can't for the life of me remember how long I stayed at work. Even then I didn't remember leaving to go home to be with the kids. He called many times, and I could hear the sadness in his voice. There were sounds in the background, and he sadly told me those were the sounds of bodies hitting the ground. I distinctly remember how it sounded as if he were crying. My heart ached at the reality of the situation and how he was there enduring it all.  He was going to be a priest before, and the church meant something to him. Having him witness all of this changed him. It bought back memories of Vietnam and that was something he never talked about. When I first met him, he had fighting nightmares almost every night. He would punch and hit and cry out in his sleep. It would be years more before that stopped. 9/11 bought that all back with a vengeance. His beloved friend died there, and it hit hard.

That night I remember the kids talking about it while we watched the coverage on television. I looked for him in every scene. It wasn't until he called that our minds were at ease. I don't remember when they put up 800 numbers for different departments but not hearing from Cornell left me in a panic. I remember hearing Evan running down the stairs into my bedroom and asking if I had heard from his father. He was so scared. We called the 800 number and the person

on the other was so kind. He said if his name wasn't on the list then he was alive and well. Evan and I breathed a sigh of relief. He eventually would come home a couple of days later to rest and change. He talked about it with me. His face and movements were sad. He would do this routine for a little over a month. Go, come back to change, and clean up. At one point, he said they had to remove their masks because when they crawled through the debris to find people it kept hitting the ground, rocks and other debris hurting them and preventing them from making progress. I yelled at him to keep it on or tie something around his face. Those words I will never forget. He said sometimes they had to stick their heads in small holes and with the masks on they couldn't do it. When his time there was over, he was a different person. The loss of fellow firefighters and others had such an impact on him that he never recovered from it. The sadness would last for the rest of his life.

7.        Cornell was always on a diet at least once a year. In the end of 2013, he was walking every day, about a mile or more. I can't remember how long, but his destination was past the length of the cemetery, so it was a long way away. Evan, our son, came home from the Navy and we went to Cornell's favorite Brazilian place. He ate so little we all noticed. He said he wasn't too hungry, so we let it go. In January of 2014 he couldn't eat much. He believed his stomach must have shrunk due to his not eating much. I told him he had better start eating again because he looked awful. He lost so much weight in such a short period of time. He stayed at his daughter's house during the week because he wanted to ensure his granddaughter was being taken care of. I told him to eat or see a doctor. Later that month, we learned he had pancreatic cancer. Idris and I talked and said Cornell must stay with us to make sure he gets proper treatment. We would not allow him to go back. The loss of weight was the most obvious sadness. The weakness was pitiful because he was without a doubt the second strongest person I knew. When he caught a cold, it

lasted not even twenty-four hours. He was never sick to the point where he needed to be hospitalized. It was a devasting time for all of us. His sister and friend he grew up with would pick us up for his chemo and hydration treatments. Others would try to get him to switch to another facility, but in Cornell's words, "I love my doctor and won't go anywhere else." That doctor used to call Cornell "Young man." "How are your young man?" Cornell was comfortable with him, and I was also. He proposed to me, and I said no. I don't want to get married. I believed he would get better. I don't know now if I believed it or hoped it so badly, I made myself believe it. I still don't know. Eventually, in April, I agreed. Prior to his sickness, I had a discussion with my mother that I might agree to marry him after all these years.  We got married at the courthouse and for whatever reason I remember the police officer who checks your clothing yelling at him because he had forgotten he had some metal thing in his coat pocket. He was berating him about how he could forget, and Cornell just stood there taking it.  I ran back and started screaming at the officer. I was pissed. I shouted "Look at him! Does he look healthy to you damn it. What gives you the right to yell at him!" I said all kinds of things to that man who just took it. Cornell almost fell back he was so weak. The other one tried to calm me down when I told him the situation. He apologized for the disgusting behavior of his colleague, and I took Cornell and walked off.  I caught a slight smile on his face. He was happy, I later learned, that I defended him so fiercely.  Those kinds of things meant something to him. His health went downhill after that at such a speed it was mind boggling.  He was scheduled for surgery in March, and when they opened him up, they backtracked and cancelled it. His pancreas was too badly inflamed. We later learned his cancer was stage 3b+. I don't remember if a or b was the one closer to stage four.  His weight loss was horrendous to witness. His weakness was mind boggling. He would fall often, and we couldn't pick him up because it hurt too much. He had to hold on to our arms as tight as he could so we could pull.

Another aspect to the devastation was how many times we ended up in the emergency room. He had to endure just lying there while we all watched and listened to the doctors saying they could do nothing except give morphine if he wasn't already taking it or giving him a bag to hydrate him. When the end of September of that year came around, he ended up in the hospital. I knew then he would never return. He was hallucinating and almost incoherent at times. From there he would go to Hospice. I slept there day and night, only returning home once he could no longer speak, close his eyes, or close his mouth. He could hear all that was going on, though. I believe it because he could still feel pain. When they changed his bed linens, they lifted the sheet with him on it and he made sounds of pain. That told me he could hear.

8.      After his death we all were devastated. It still was unbelievable. I had prayed every day while he was sick to let me be the one who was in his situation. His loss had such an impact that I felt insecure. He was safety to me. He was there when I needed him through all my sickness and surgeries and just there. I felt so insecure at that point. Having him by my side was security to me. I felt safe. No long feeling safe, I became depressed. I didn't take care of myself and didn't realize I was hoarding. It started out with just random things and eventually evolved into shoes and clothing. I never got my depression treated as I recognized it but didn't care to take care of myself. I could not overcome he guilt I felt that he died instead of me. In 2017, I finally went out for a walk. Not to just to walk the dog but to go to main street like I used to. All I remember was waking to a blue sky. I blacked out and didn't remember how or why. When I got home, I was speaking to Cornell's sister and told her what happened. She told me to call the doctor immediately. I didn't agree but she won. My doctor told me to go to the nearest emergency room immediately. I did. I don't know what happened because I left the next day. It was disgusting to be there, and they claimed I was possibly dehydrated. I took that and ran because I didn't want brain scans. I

was sort of forced to move to New Jersey because of this. My older son had already moved here, and he wanted me near him in case of emergencies. I hate New Jersey but agreed to it. I have not been happy here once yet. Depression kept rearing its ugly head big time.  Covid happened and I was already a food hoarder.  I began canning, dehydrating, and learning how to save and preserve food before but covid gave me a push.  I began buying food and shelves and portable toilets and much more. I bought cases of dehydrated foods from the Mormons and Amazon. I bought canning jars and began vacuum sealing rice, beans, tea, batteries, oil lamps, camping gear etc.  I bought regular groceries and a dead body freezer even though I had three other freezers already. I was canning meats, vegetables, making and canning all kinds of stocks and homemade tomato sauces. These things I didn't do for myself.  I did in case my kids and other family members needed them. After learning some lost jobs, I allowed them to come and take what every they needed and wanted. It did make me feel good though it was an empty feeling.  I am under control but live in a hot mess. I am too ashamed to have anyone help me to see this place and in too much pain due to hip problems to do much. I want to move and was supposed to be gone by now, but the mess is too awful to put this place on the market just yet.  I will be living near my only grandkids and that has made such an impact on me that I stopped buying unnecessary things. I think I will always feel insecure without him, but I will keep in mind that he would not like to see me like this. Moving to be near my grandkids will be the most positive thing that I can do for myself. To this day, I still feel the guilt, but I try hard to keep in mind that this, none of us, had any control over.  If it could be chosen, I would have chosen myself to be the one who got sick. There is no doubt about it.

ELIZABETH HORNE

Sworn before me this

2nd day of August 2023

MIGUEL A MEDINA
Notary Public of New Jersey
I.D. 50366698
COMMISSION EXPIRES: 05/11/2025

Evan Horne

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X

In Re:

TERRORIST ATTACKS ON                          03-MDL-1570  (GBD)(SN)
SEPTEMBER 11, 2001

------------------------------------------------------------ X     **AFFIDAVIT OF**
RAYMOND ALEXANDER, et al.,                          **EVAN HORNE**


                                        Plaintiffs,          21-CV-03505  (GBD)(SN)


                        V.

ISLAMIC REPUBLIC OF IRAN,

                        Defendant.
------------------------------------------------------------ X

STATE OF MARYLAND        )
                                      : SS
COUNTY OF CHARLES        )


EVAN HORNE, being duly sworn, deposes and says:

1.      I am a plaintiff in the within action, am over 18 years of age, and reside at 1010 Allward Drive, Waldorf, Maryland, 20602.

2.      I am currently 36 years old, having been born on May 22, 1987.

3.      I am the son of Decedent, Cornell Horne upon whose death my claim is based, and submit this Affidavit in connection with the present motion for a default judgment and in support of my solatium claim.

4.      My father passed away from pancreatic carcinoma on October 5, 2014, at the age of 66. It was medically determined that this illness was causally connected to his exposure to the toxins resulting from the September 11, 2001, terrorist attacks at the World Trade Center.

5.     Growing up, my father was tough on me. He was not tough in a bad way, but more in preparation for the rough side of the world. He loved me, and he showed it the only way he knew how: laughs, education, and sports. My father was a mountain in his aura. People always listened when he spoke, and he was always there for everyone, family or friend. There are so many special memories I have with him, including trips we took to different states to visit family, him being at every sport I signed up for, plays camping trips, and fishing trips. Even with the busy schedule of being a NYC firefighter, he made sure he was there for me. One precious memory I have is the first day of my graduation from Naval bootcamp in 2010. The Commanding Officer asked any veterans to rise so that they may be thanked for their service. My division was directly in front of where my family was seated. My father locked eyes with me and I knew that we were no longer just father and son, but brothers in arms. I knew from the look in his eyes that was what he was saying and how truly proud he was of me. The second memory I have is coming back from leave for the first time in 2011. I was a part of what is called a Mobile Security Squadron, tasked with anti-terror, force protection, and anti-piracy to civilian ships that support the Navy in the Middle East. We were small teams deployed to civilian ships to make sure something like what happened during the Maersk Alabama hijacking never happened again. My first deployment was rough, and I had a lot to process. On top of that, I was coming home right at the time Osama Bin Laden was killed, which meant the overall tension was high in the entire Middle East where I was stationed. When I got home that year, my father knew right away what was wrong with me and planned a trip to Georgia to visit family, our cousin Sam in particular. My father and Sam were both Vietnam vets and were always close. That night at Sam's house, we shared drinks and

exchanged stories. They let me talk and ramble on even though what I had been through was nothing in comparison to what they had been through. They let me talk with no judgement or fear or feeling insignificant. I knew at that moment there was no detail or secret that I couldn't tell my father.

6.      My memories of 9/11 are both foggy and sharp as if they were happening today. I was sitting in Spanish class in the 9th grade. I believe I walked to school that day with a few of my friends. I remember saying goodbye to my father before he drove to work in Brooklyn Ladder 176 Engine 233. My mother was going to work in Great Neck, Long Island. I remember our principal had announced it over the school's speaker system, and I immediately knew my father was going there. I remember leaving school even though we were told to stay in place until a parent could pick us up, but it would have been hours before my mother could get there because of the traffic. I managed to get home and call my father right away, and he was stuck in traffic on the way to the towers. He told me that he could see the smoke from where he was on one of the bridges before we were cut off. I remember crying at a friend's house waiting for my mother to get home. I think it was two weeks before I heard from him or anyone who knew he was okay. He called me and told me not to worry and that he was still working on saving people. He said keeping track of emergency services was hard, so I might not hear from him for a while again.

7.      My parents, especially my father, didn't tell me about his diagnosis at first. I was due to go on leave while stationed in Japan in 2014. I believe it was a week or two before I was supposed to come home when my mother finally opened up and told me about his diagnosis. She told me that I needed to come home immediately as he was supposed to have surgery. I was heartbroken because, for the first time at 27 years old, I'd seen my father weak and afraid. He didn't actually show it, but I could tell. I remember them saying that he was only stage 2 and that

once the inflammation had gone, surgery would have been able to remove the cancer. Once my leave was over (2 weeks) I returned to Japan; I was set to transfer to Hawaii in September of 2014. Right before my transfer leave started, yet again I found out that my father had gotten worse and that I needed to get home to say my goodbyes. It turns out that, from what I remember, it wasn't stage 2, but it was stage 4 the whole time. My father wanted me to keep living and enjoying my life because he knew that if I knew how bad it was, it would tarnish my memories of Japan, a place I dreamed of being my entire life. I arrived back home only a few days before he was unable to speak. He held out just long enough to tell me how proud he was of the man I had become. I can still hear his voice telling me. I didn't know until after he passed how much pain he was in everyday or how sick he felt because he refused to let me see it. I remember on October 4, 2014 I told him, "He was the best father I could have ever asked for, that I remember all the things he taught me, like checking to see if the electric was off before changing any outlets, and when to check the gutters for leaves, and changing oil on my car, and that one day when I had my kids I would pass all he's taught me to them." He died the next day on October 5, 2014.

8.  My father's death was the hardest thing I've had to deal with in my entire life. Not even my mother realized how hard it hit me. Because I was on active service in the Navy, I was only given two weeks of emergency leave after his passing. Two weeks to grieve my father and console my mother and the rest of my family. I was the youngest of my siblings, and yet, like my father, I felt I had to be strong and not show my true emotions. I was mad that I didn't know how sick he was and no one told me; I was mad that while I thought he was doing okay, I was out living my life in Japan while he was dying. I was angry, distraught, miserable, and most of all, suicidal. From all the horrible things I've seen in my career while in the service and not having my father, it boiled up. I was stationed in Hawaii, one of the most beautiful places on Earth, and I couldn't see

it. Everywhere I looked I saw and heard my father. I heard my mother crying, but I wasn't there for her. I heard the grief in my brother, but I could do nothing for him. My sister and I became estranged after his passing. I was alone with my demons, and I had no one I trusted to hear them. I attempted to take my life twice before I found someone who pulled me out of the darkness who would later become my wife and the mother of my children. I have since progressed from suicidal thoughts, but I still am heartbroken that he never got to meet his grandsons or see my wife and I get married on the beach. My boys never got to talk to their grandpa and hear stories of his time as a firefighter. I still cry when I see them run around with firefighter helmets on because what boy isn't obsessed with being a firefighter. Firefighters are larger than life; they selflessly run towards the firefighter. My boys look at pictures of my father and are in shock and awe of who he was, but they've never known him. The passing of my father rocked me to my core in ways that I will ever recover from.

EVAN HORNE

Sworn before me this

24th day of July, 2023

Notary public

PARIS WALTON
Notary Public - State of Maryland
Charles County
My Commission Expires Jun 26, 2026