# EXHIBIT OO

Estate of Daniel G. Smith

# VCF Documentation



September 11th
Victim Compensation Fund

June 4, 2019

BRITTANY SMITH
C/O WENDELL TONG
SULLIVAN PAPAIN BLOCK MCGRATH & CANNAVO, PC
120 BROADWAY 18TH FLOOR
NEW YORK NY  10271

Dear BRITTANY SMITH:

The September 11th Victim Compensation Fund ("VCF") has reviewed your Eligibility Form. You submitted an Eligibility Form on behalf of DANIEL SMITH.  Your claim number is VCF0100094.  Your Eligibility Form was determined to be substantially complete on June 03, 2019.  As stated in the Regulations and on the claim form, by filing a substantially complete Eligibility Form, you have waived your right to file or be a party to a September 11th-related lawsuit on behalf of the decedent and his or her survivors.

**The Decision on your Claim**

The VCF has determined that the decedent has met the eligibility criteria established in the statute and regulations.  Based on the information you submitted and information the VCF has received from the World Trade Center ("WTC") Health Program, the decedent has been found eligible for the following injuries:

- MALIGNANT NEOPLASM OF BRAIN UNSPECIFIED SITE

Please note that there are several reasons why an injury that you think should be eligible is not listed above.  For non-traumatic injuries, the name of the injury is based on the information provided by the WTC Health Program and there may be different names for the same injury. Additionally, your injury may not be listed if it was only recently certified for treatment by the WTC Health Program.

If in the future the WTC Health Program should notify you that a condition previously found eligible is no longer certified, you must inform the VCF as this may affect your eligibility status and/or the amount of your award.

**What Happens Next**

**If the decedent was certified for treatment by the WTC Health Program for a condition not listed above**, you should amend your claim.  Please see the VCF website for details on how to amend your claim.  The VCF will review the new information and determine if it provides the basis for a revised decision.

**If you believe the decedent had eligible injuries not treated by the WTC Health Program** and you would like the VCF to consider those injuries before calculating the amount of any compensation, you should amend your claim.  If you choose to amend your claim, you will need



September 11th
Victim Compensation Fund

to use the VCF Private Physician process.  The Private Physician process is a way for the VCF to gather the required information about the decedent's treatment in order to process your claim. All forms are available on the VCF website under "Forms and Resources."  The website also includes detailed information and instructions on the Private Physician process.

**If the decedent did not have injuries other than those listed above,** you should submit your Compensation Form and required supporting materials.  If you have already submitted your Compensation Form, you do not need to take any action at this time unless you receive a request from the VCF for missing information.  The VCF will calculate the amount of any compensation based on the conditions listed above after all compensation-related documents are submitted.

If you have questions about the information in this letter or the claims process in general, please call our toll-free Helpline at 1-855-885-1555.  For the hearing impaired, please call 1-855-885-1558 (TDD).  If you are calling from outside the United States, please call 1-202-514-1100.

Sincerely,

Rupa Bhattacharyya
Special Master
September 11th Victim Compensation Fund

cc: BRITTANY SMITH



September 11th
Victim Compensation Fund

April 13, 2020

BRITTANY SMITH
C/O WENDELL TONG
SULLIVAN PAPAIN BLOCK MCGRATH & CANNAVO, PC
120 BROADWAY 18TH FLOOR
NEW YORK NY  10271

Dear BRITTANY SMITH:

The September 11th Victim Compensation Fund ("VCF") sent you a letter on January 27, 2020 notifying you of the decision on your claim and the amount of your award.  Your claim number is VCF0100094.  That letter included a request for documents that were missing from your claim and are required in order to process your payment.  The VCF has since received the requested documents and this letter provides the details of your award and information on the next steps to be taken on your claim.

After reviewing the responses in your claim form, the documents you submitted in support of your claim, and information from third-party entities, the VCF has calculated the amount of your award as **$843,678.29**.  This determination is in accordance with the requirements of the Never Forget the Heroes: James Zadroga, Ray Pfeifer, and Luis Alvarez Permanent Authorization of the September 11th Victim Compensation Fund Act ("VCF Permanent Authorization Act").  The enclosed "Award Detail" includes a detailed explanation of the calculation and a list of the eligible conditions that were considered when calculating your award.

The earnings basis includes earnings from Silver Star Limo, but not Local 553 as Daniel had voluntarily retired from the latter position in 2011.

Mrs. Smith received an increased Social Security Retirement benefit based on Daniel's earnings record. The difference between her award based on her own earnings record and the award based on Daniel's earnings record must be offset against the lost earnings award, as a collateral source payment that resulted from Daniel's death.  Because this offset exceeds Daniel's calculated lost earnings, there is no award for lost earnings and we did not separately calculate any offset for the survivor pensions from Local 553 and Joint Council 16.

The VCF awarded $200,000 in additional noneconomic compensation in consideration of Daniel's surviving spouse and dependent child, Dylan. The VCF did not award an additional $100,000 in consideration of Brittany as she was not financially dependent on Daniel. The award includes compensation for food cooking and cleanup, outdoor chores, home maintenance services, and care services for Dorothy, previously performed by Daniel.

No non-routine legal service expenses are approved for reimbursement for this claim.



September 11th
Victim Compensation Fund

**What Happens Next**

The VCF will deem this award to be final and will begin processing the full payment on your claim unless you complete and return the enclosed Compensation Appeal Request Form within **30 days from the date of this letter** as explained below.  If you do not appeal, the Special Master will authorize the payment on your claim within 20 days of the end of the 30-day appeal period.  Once the Special Master has authorized the payment, it may take up to three weeks for the United States Treasury to disburse the money into the bank account designated on the VCF ACH Payment Information Form or other payment authorization document you submitted to the VCF.

- **Appealing the Award**: You may request a hearing before the Special Master or her designee if you believe the amount of your award was erroneously calculated, or if you believe you can demonstrate extraordinary circumstances indicating that the calculation does not adequately address your loss.  **If you choose to appeal, your payment will not be processed until your hearing has been held and a decision has been rendered on your appeal**.

  To appeal the award, you must complete two steps by the required deadlines:

  1. Complete and return the enclosed **Compensation Appeal Request Form** within **30 days from the date of this letter**.  Follow the instructions on the form and upload it to your claim or mail it to the VCF by the required deadline.  If you do not submit your completed Compensation Appeal Request Form within 30 days of the date of this letter, *you will have waived your right to an appeal* and the VCF will begin processing any payment due on your claim.

  2. Complete and submit your **Compensation Appeal Package** (Pre-Hearing Questionnaire, Compensation Explanation of Appeal, and all applicable supporting documents) no later than **60 days from the date of this letter**.  It is important that you carefully review the information enclosed with this letter and follow the instructions if you intend to appeal your award.  Additional instructions on the appeals process can be found on the VCF website under "Frequently Asked Questions" and in the "Policies and Procedures" document.

  Once your complete Compensation Appeal Package is submitted, the VCF will review the information to confirm you have a valid appeal, and will notify you of the next steps specific to your appeal and the scheduling of your hearing.

- **Notifying the VCF of new Collateral Source Payments**: You must inform the VCF of any new collateral source payments you receive, or become entitled to receive, such as a change to your disability or survivor benefits, as this may change the amount of your award.  If you notify the VCF within 90 days of learning of the new collateral source payment, your award will not be adjusted to reflect the new entitlement or payment.  If you notify the VCF more than 90 days after learning of the new or revised entitlement or payment, the VCF may adjust your award to reflect the new payment as an offset, which may result in a lower award.  If you need to notify the VCF of a new collateral source



September 11th
Victim Compensation Fund

payment, please complete the "Collateral Offset Update Form" found under "Forms and Resources" on the www.vcf.gov website.

Your award was calculated using our published regulations, and I believe it is fair and reasonable under the requirements of the VCF Permanent Authorization Act.  As always, I emphasize that no amount of money can alleviate the losses suffered on September 11, 2001.

If you have any questions, please call our toll-free Helpline at 1-855-885-1555.  For the hearing impaired, please call 1-855-885-1558 (TDD).  If you are calling from outside the United States, please call 1-202-514-1100.

Sincerely,

Rupa Bhattacharyya
Special Master
September 11th Victim Compensation Fund


cc: BRITTANY SMITH



September 11th
Victim Compensation Fund

# Award Detail

Claim Number:     VCF0100094
Decedent Name:    DANIEL SMITH

| PERSONAL INJURY CLAIM (Losses up to Date of Death) | |
|---|---|
| **Lost Earnings and Benefits** | |
| Loss of Earnings including Benefits and Pension | $0.00 |
| Mitigating or Residual Earnings | $0.00 |
| **Total Lost Earnings and Benefits** | $0.00 |
| | |
| **Offsets Applicable to Lost Earnings and Benefits** | |
| Disability Pension | $0.00 |
| Social Security Disability Benefits | $0.00 |
| Workers Compensation Disability Benefits | $0.00 |
| Disability Insurance | $0.00 |
| Other Offsets related to Earnings | $0.00 |
| **Total Offsets Applicable to Lost Earnings** | $0.00 |
| | |
| **Calculated Lost Earnings and Benefits after Offsets** | $0.00 |
| | |
| **Total Lost Earnings and Benefits Awarded** | $0.00 |
| | |
| **Other Economic Losses** | |
| Medical Expense Loss | $6,820.35 |
| Replacement Services | $0.00 |
| **Total Other Economic Losses** | $6,820.35 |
| | |
| **Total Economic Loss** | $6,820.35 |
| | |
| **Total Non-Economic Loss** | $250,000.00 |
| | |
| **Subtotal Award for Personal Injury Claim** | $256,820.35 |



September 11th
Victim Compensation Fund

| DECEASED CLAIM (Losses from Date of Death) | |
|---|---|
| **Loss of Earnings including Benefits and Pension** | $83,396.00 |
| | |
| **Offsets Applicable to Lost Earnings and Benefits** | |
| Survivor Pension | $0.00 |
| SSA Survivor Benefits | ($117,555.50) |
| Worker's Compensation Death Benefits | $0.00 |
| Other Offsets related to Earnings | $0.00 |
| **Total Offsets Applicable to Loss of Earnings and Benefits** | ($117,555.50) |
| | |
| **Calculated Lost Earnings and Benefits after Offsets** | ($34,159.50) |
| | |
| **Total Lost Earnings and Benefits Awarded** | $0.00 |
| | |
| **Other Economic Losses** | |
| Replacement Services | $122,779.00 |
| Burial Costs | $14,333.94 |
| **Total Other Economic Losses** | $137,112.94 |
| | |
| **Total Economic Loss** | $137,112.94 |
| | |
| **Non-Economic Loss** | |
| Non-Economic Loss - Decedent | $250,000.00 |
| Non-Economic Loss - Spouse/Dependent(s) | $200,000.00 |
| **Total Non-Economic Loss** | $450,000.00 |
| | |
| **Additional Offsets** | |
| Social Security Death Benefits | ($255.00) |
| Life Insurance | $0.00 |
| Other Offsets | $0.00 |
| **Total Additional Offsets** | ($255.00) |
| | |
| **Subtotal Award for Deceased Claim** | $586,857.94 |



September 11th
Victim Compensation Fund

| Subtotal of Personal Injury and Deceased Claims | $843,678.29 |
|---|---|
| PSOB Offset | $0.00 |
| Prior Lawsuit Settlement Offset | $0.00 |
| **TOTAL AWARD** | $843,678.29 |
| | |
| **Factors Underlying Economic Loss Calculation** | |
| Annual Earnings Basis (without benefits) | $19,048.24 |
| Percentage of Disability attributed to Eligible Conditions - applicable to Personal Injury losses | |
| Start Date of Loss of Earnings Due to Disability - applicable to Personal Injury losses | |

| Eligible Conditions Considered in Award |
|---|
| Malignant Neoplasm of Brain Unspecified Site |

# Family Member Affidavits

Jamie Gilbert

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X

In Re:

TERRORIST ATTACKS ON                              03-MDL-1570 (GBD)(SN)
SEPTEMBER 11, 2001

------------------------------------------------------------- X    **AFFIDAVIT OF**
RAYMOND ALEXANDER, et al.,                         **JAMIE GILBERT**


                              Plaintiffs,          21-CV-03505 (GBD)(SN)


              V.

ISLAMIC REPUBLIC OF IRAN,

                              Defendant.
------------------------------------------------------------- X

STATE OF NEW YORK          )
                           : SS
COUNTY OF BRONX            )


       JAMIE GILBERT, being duly sworn, deposes and says:

       1.      I am a plaintiff in the within action, am over 18 years of age, and reside at
731 Clarence Avenue, Bronx, New York 10465.

       2.      I am currently 72 years old, having been born on February 13, 1951.

       3.      I am the sister of Decedent, Daniel G. Smith, upon whose death my claim is
based, and submit this Affidavit in connection with the present motion for a default
judgment and in support of my solatium claim.

       4.      My brother passed away from brain cancer on February 7, 2016, at the age of 63
years old. It was medically determined that this illness was causally connected to his exposure to
the toxins resulting from the September 11, 2001, terrorist attacks at the World Trade Center.

5.      My brother was 18 months younger than me. We did everything together from when we were kids all the way until the point where we couldn't anymore. As kids we would go swimming, and all throughout our lives we would go to ballgames, tennis matches, museums, anything you can think of. We even went to the same school as each other. He chose me to be the Godmother of his daughter Brittany. He was, for 63 years, the best, most important part of my life.

6.      I remember the day of the attacks that he was in lower Manhattan because he drove an oil truck. I remember him telling me that he saw people running and he didn't know what they were running from until he saw what had happened to the world trade. I was off from work on that day because my boss was in Italy. I thought that we might die, so I drove to Dylan's school and picked him up because if we were going to die, we were going to die together. I couldn't get in touch with Daniel because cellphones were of course, not prevalent back then. After the attacks, Daniel had gone back to lower Manhattan everyday to fuel the machines that were used in the recovery efforts.

7.      My brother had Glioblastoma and 14 years later, it made a noticeable affect on his health. In May of 2015, me and my niece Brittany started to notice that Daniel would repeat things he had already said, and was often forgetful as well. Me and my niece both had growing concern over this. On July 4, 2015,  I had arrived at his house at 10 in the morning, to see that he opened the door in his pajamas, which was very unlike him. I thought he was having a stroke because he kept telling me someone was calling me. I took him to the hospital and about seven hours later they had broke the news to us that they had found something on his brain. This was devastating news for me and my family. He had to receive radiation therapy treatments every day for the next several months and started losing his hair.

8.      When he was sick, we had to take him to radiation therapy every day of the week for several months. He couldn't take Dylan anywhere like he used to. We were lucky enough to spend Thanksgiving and Christmas with him before he passed away on February 7, 2016. Due to his passing, Brittany had to move in with me due to complications with her mother. The biggest thing in losing my brother was trying to find the strength to move on in life without him. I had to continue my life without being able to talk to him or even give him a call. His passing was and is, the worst thing that ever happened to me and my family.

_Jamie Gilbert_
JAMIE GILBERT

Sworn before me this
2nd day of August 2023

_[signature]_
Notary public

MIREYA POLANCO NO. 01PO6034694.
MIREYA POLANCO
No. 01PA6034694
Notary Public, State of New York
Qualified in New York County
My Commission Expires Dec. 13, ___
New York.
Bronx
exp June 4th, 2026

Brittany Smith

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X

In Re:

TERRORIST ATTACKS ON                         03-MDL-1570 (GBD)(SN)
SEPTEMBER 11, 2001

-------------------------------------------------------------- X     **AFFIDAVIT OF <u>BRITTANY</u>**
RAYMOND ALEXANDER, et al.,                              **<u>SMITH</u>**


                                   Plaintiffs,      21-CV-03505 (GBD)(SN)


            V.

ISLAMIC REPUBLIC OF IRAN,

                              Defendant.
-------------------------------------------------------------- X

STATE OF NEW YORK        )
                         : SS
COUNTY OF BRONX          )


        BRITTANY SMITH, being duly sworn, deposes and says:

        1.      I am a plaintiff in the within action, am over 18 years of age, and reside at
3285 Lucerne Street, Bronx, New York 10465.

        2.      I am currently 40 years old, having been born on January 23, 1983.

        3.      I am the daughter of Decedent, Daniel G. Smith, upon whose death my
claims are based. I submit this Affidavit in support of the present motion for a default
money judgment for the claim made on behalf of my father's estate and for my solatium
claim. On October 1, 2019, I was issued Letters Testamentary as Executor of my father's
estate by the Bronx County Surrogate's Court.

        4.      My father passed away from brain cancer on February 7, 2016, at the age of 63
years old. It was medically determined that this illness was causally connected to his exposure to
the toxins resulting from the September 11, 2001, terrorist attacks at the World Trade Center.

5.      Daniel Smith, the decedent, was my father, my best friend, my biggest fan, my mentor, and my hero. My Father and I did everything together.   To even try to put on paper all the things that we did together and how much he means to me would be doing an injustice to just how very special our relationship is and was, but I will do my best to try to portray it.  We spoke every day on the phone at least once.  He was the person that I would call first for everything: happy news, sad news, a funny story, an injury, or illness, or just to vent and vice versa.

6.      As a child, he took me everywhere along with my two best friends, and sometimes all my friends.  We were his sidekicks.  He would bring us to Robert Moses Beach in the summer, drive us and pick up us to and from whatever activity were participating in at the time, whether it be dance, gymnastics, or sports, take us to parks, the circus, sporting events, concerts... you name it, we went.  He was my softball coach and umpire, referee for my basketball games, taught me how to swim, bicycle ride, fly a kite… everything. He brought me and my friends to Disney World, Wildwood trips every summer, Caribbean vacations, yearly trips to amusement parks and so much more.

7.      As I got older, he was the one that would drop us off and pick us up from parties, nightclubs, and bars. He was the one that would wait up till all hours to make sure I got home safe from wherever I was coming home from when I went out.  He once drove a limo party bus for me and 24 of my friends to the Britney Spears concert in NJ.  He also drove the limo for my best friend's wedding while being a guest at it as well, changing clothes in the bathroom so that he could look official for the pictures for the couple.  He was the absolute best. We continued to have daddy daughter dates, travel together, and make special memories up until his very last breath. Broadway was often our place for special dates. As a matter of fact, on July 1st, 2015, the day I realized something was very wrong with my father, we went to see the Larry David play on

Broadway at the time.  This is difficult to write because there isn't a thing that I did not do with my dad, there isn't a special memory that I have that he wasn't a part of, let alone, that he didn't facilitate. There isn't a moment since his death that I haven't missed him so much that it physically hurt to even think about the fact that he is no longer here with us.

8.      At the time of September 11, 2001, he was working as the shop steward for an Oil Company named Castle Oil Corporation. That company, by chance got the account to run and maintain the generators for the equipment for the search and rescue after the attack on the Twin towers on 9/11/2001. On 9/11/2001, when the towers were hit my father was 3 blocks away on rector street delivering oil to a building. He watched as the first plane hit and, as I recall, he told me that as he watched the second plane hit, he thought an air traffic controller had made a big mistake and was flying planes into the building. My father got in his tractor trailer and tried to head back to Hunts point to the Oil terminal. It took him until about 6 pm that night to finally make it back and for us to know that he was alive and safe. When he made it to the terminal, he was told that they needed help for the search and rescue and that the company was to supply the oil to run the generators.

9.      As top guy on the job, my father had the authority to assign someone else for this task, but that wasn't the type of guy he was. He wasn't one to pass the buck or to duck out on responsibility. He was someone that always extended a hand if not two when someone was in need and he was proud that he could do something to help his neighbors that were missing, his city that had been attacked and his nation that was shattered. For the next 6 months, every single day that my father worked he was stationed down at Ground zero for 8-12 hours a day, refueling the generators and assisting with the search and rescue in whatever capacity he could. He was there until the very last beam was extracted, to which he took a picture of them removing and him standing next to it.

10.      My father was never sick with anything, other than a bad cold, a day in his life before getting diagnosed with Terminal Glioblastoma brain cancer in July of 2015.   He was a man that was

stronger than life, built like a bull and serious about exercise and his wellness.  He didn't drink or smoke or take pills or do any drugs.  He lived an active healthy lifestyle and participated in volleyball, racquetball, basketball, softball, swimming and biking weekly.  In fact, his first overnight stay ever in the hospital was July 4, 2015, the day that a CT scan revealed that he had a mass in his brain that needed to be further investigated.

11.     The few weeks leading up to the 4th, I had started to notice little things that were concerning my father's wellbeing.  As I mentioned before, he and I spoke every day and I had started to notice that he was repeating himself a bit more than usual, had started to misplace his pronouns, and was forgetting things that had recently occurred.  In early June of 2015, I spoke about my concern with his sister, Jamie Gilbert, and she affirmed that she had noticed some changes in Dad's memory and verbiage as well.  My father was not one to visit doctors or hospitals or ever admit that he was weak or in need so we decided that we would observe him more closely and see if a doctor's visit was called for.

12.     Later that month we had a family trip to Florida, and I was with him for seven days straight.  During that vacation, it didn't appear that anything was seriously wrong but, in fairness, my mother was struggling with a different cluster of ailments and took away the focus from my father.  Upon returning from vacation, the next time I noticed something off with my dad was on a phone call on July 1, 2015.  That night we were having dinner in the city and going to Broadway to see a show together and he called to confirm the logistics of the plans.  During that phone call, he was unable to recall a major event that had occurred in our family just a few weeks before and was adamant that he hadn't participated in the event.  I called my mother and my aunt again and expressed my overwhelming concern and suggested we get medical attention for him immediately.  Knowing that we were going to be faced with resistance from my dad, our plan was that I would follow through with the date that we had that night and that if I was concerned with any behavior, I would take him to an ER or call an ambulance.

13.     When we met up that night, he seemed completely normal, aside from still not being able to recall that family event that occurred.  We had a great time at dinner and the show, and everything was

completely typical other than at the end of the night him having some difficulty locating where the car was parked. For most, forgetting where they parked their car in Manhattan may be completely normal, but for my father who drove a tractor trailer in Manhattan every day for nearly thirty years, this was a red flag for me but not extreme enough for me to call an ambulance. He drove me home to Long Island that night and drove back home to the Bronx without incident.

14.    The next day, a Friday, I called my cousin that was a nurse at Lenox Hill and told her of my concerns and we decided that on Monday we would have him see one of the doctors at her hospital. On Saturday, the 4th of July, I received a phone call from my aunt stating that my father was taken to the ER of Montefiore Einstein Hospital in the Bronx and that not to be alarmed but he was having some difficulty remembering what he was doing, and they were running some tests to see if he had suffered a stroke. I immediately left Long Island and met them at the hospital. There they did a CT of his brain and found a mass that they were concerned about.

15.    Being that it was a weekend and a holiday, the hospital was on a skeleton staff and wouldn't have clear information for a day or two. My dad, with me by his side, spent the next 3 days at Einstein awaiting further assessment and instruction on what the next steps to take were. On Tuesday of that week, they transferred him to Montefiore Moses on Gun Hill Road in the Bronx, where the next day he underwent a needle biopsy of his brain. After surgery, he was released from the hospital the next day but was told because of his great risk for seizure that he was not safe to ever be left unattended and if we couldn't ensure that he would be safe and always be supervised at home then he would have to be placed in a nursing facility. I made the decision at that moment that I would go on leave from my job and my schooling and be his personal caretaker from then on and that we could be taking him home. The surgeon stated that by the appearance of the biopsy that the mass was most likely malignant but couldn't be certain until the final pathology came back.

16.    Upon receiving the final pathology report a few weeks later, it was confirmed that the mass was a stage IV high grade glioblastoma and according to the scans was inoperable for resection. I

sent the pathology report and scans to NY Sloan Kettering's head of Neurosurgery, and we attended an appointment for a second opinion, where the original diagnosis of the mass being inoperable was affirmed. We met with the neurooncologist, Dr. Mary Welch, and constructed a preliminary treatment plan, although we were told that this diagnosis was deemed terminal with no cure. My father endured 6 weeks of radiation and chemotherapy concurrently. After the six weeks of treatment, an MRI was done that showed the cancer had not been affected by the treatments. The masses had increased in size and although there were experimental treatment options, none came without major quality of life changing side effects and didn't promise an increase in quantity of life either.

17.     My father, with me and my family's input, decided that no further aggressive treatment would be done. My father was given 12 to 16 months to live at 62 years of age. He passed away February 7, 2016. I remained his main caretaker until February 3, 2016, when my father's care became unmanageable at home and was moved to Calvary Hospice Hospital in the Bronx. From July 4th to February 7th, I watched as my father progressively declined, although I also had the honor to witness every day the resilience, positivity, and determination that this magnificent man exerted. I can remember coming out of Mary Welch's office after being told that nothing more really could be done and him saying to me, "it could be worse, this could be happening to one of my kids. I had a great life."

18.     My father fought to stay as healthy as possible and mobile every day until the very end when his body couldn't anymore. He would walk three miles a day with my aunt and me, even as the winter progressed up until around December. He was mobile with limited assistance until January 19, 2016. And although his mental capacity was diminishing, he worked hard every day to try to stay as alert and aware as possible doing memory exercises, meeting with friends and family regularly to continue socialization and communication skills and to enjoy the remainder of his life as much as he could. We were able to have a big birthday party for him in late September with 70 of his closest friends and family members and have big holiday celebrations with everyone that loved him surrounding him.

19.     Of course, throughout the illness, there were rough days and obstacles that were

experienced, it was hard to explain to him the limitations that the disease had placed on a mand that was larger than life. He struggled with following safety precautions and always explained to people that he wasn't quite the same because he, as he would say, "got hurt"- never being able to concede being sick with a disease. I had to secretly follow him in a car sometimes if he insisted on going for a walk by himself in the early onset of his disease, had to turn the doorknobs backwards to ensure he didn't lock us out of the bathroom or bedrooms to maintain safety precautions because he refused to have any assistance with showering or dressing even when he needed it. There was a constant battle between him and me regarding safety precautions, but in the end, he knew I was trying to maintain his health and happiness for as long as possible without incident. He would only spend 9 days of his illness bedbound, and 5 days not in his own home. He and I together ensured that the quality of his life was never compromised by quantity, having adventures, and making memories until the very end.

20.     I think my statements above can somewhat confirm the magnitude of how my fathers' illness and death affected me and my life but again there aren't enough words in the English language to fully convey what his passing has done to me, our family, our friends, and anyone that knew him.

21.     Prior to my father's illness, I had my own apartment in Long Island with my boyfriend at the time, had a job as a paralegal in Manhattan for J.P. Morgan's Investment bank legal department, went to school at night to pursue a second degree in Nursing, and had an active social life. When it was found that my father had a mass in his brain and would need continuous supervision and care, I took a leave from my job and my schooling, gave up my apartment with my boyfriend and moved back in to my family house to take care of my ailing father, my (mentally and physically) disabled mother, and my brother who at the time was 19, in college, and had diagnosis on the spectrum of autism.

22.     I became the head of managing care, finances, and maintaining the house and

everyone's wellbeing.   My mother suffered with substance abuse at the time and on August 23, 2015, overdosed on OxyContin and had to be brought to Jacobi hospital via ambulance, was admitted to the psychiatric unit for the night and subsequently went to Phelps Rehabilitation for several days to detox and get mental health care.   I was the transportation for both of my parents, my brother being a new and inexperienced driver unable to partake in their care.   I attended every doctor's appointment, every treatment, every test, every therapy session that was offered to both of my parents in their unique situations.

23.     In turn, to handle the stress of situations I was managing, I also sought professional counseling.  The loss of my father broke my heart into one million pieces, and it will never be the same.  Upon his death, as if losing the greatest man to ever live wasn't enough, our entire nuclear and extended family fell apart in the wake of the death of the matriarch.  My mother kicked me out of our family home the day after my father's funeral, leaving me homeless and forced to stay on my aunt's, who took me in, I slept on her couch until I returned to work and could financially recover from not having any income while on leave taking care of my family's affairs. She and I feuded over the authority that had been given to me by her and my father's estate plans in court for the next 7 years, having only concluded in July of this year.

24.     My relationship with my mother no longer exists and the relationships with several other extended family members came to an end as well when they tried to extort money and power over aspects of my father and my mother's accounts.  My finances took several years to get back in order after having to take a loss of income for the 7 months of my fathers' illness.  My relationship with my boyfriend suffered with the strain that the sadness, pressure, and the conflicts after my father's passing created in my life. I suffered from anxiety attacks during and after my fathers' illness and death.  In January of 2016, I thought I was suffering from kidney stones but in fact, it

was deemed to be severe muscle spasms due to stress.

25.     Although, now almost 8 years later, certain aspects of my life have started to regain

normalcy and I can again find joy in different things, my life will never be the same and I will never

be able to experience a moment of happiness without having at least a brief moment of sadness

because my best guy isn't here to experience it with me… my graduation from nursing school,  my

first job in the hospital, my role as an everyday hero in the fight against COVID 19, the birth and

growing of my son, his first grandchild… all experienced without him… but knowing he is looking

down at me with a smile and as always, a helping hand.

BRITTANY SMITH

Sworn before me this

_____ day of _____ 2023

Notary public

ROSEMARY L. FAVA
NOTARY PUBLIC-STATE OF NEW YORK
No. 01FA5005494
Qualified in Bronx County
My Commission Expires 12-07-2026

Dylan Smith

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X

In Re:

TERRORIST ATTACKS ON                          03-MDL-1570 (GBD)(SN)
SEPTEMBER 11, 2001

-------------------------------------------------------------- X       **AFFIDAVIT OF**
RAYMOND ALEXANDER, et al.,                     **DYLAN SMITH**


                                    Plaintiffs,      21-CV-03505 (GBD)(SN)


                      V.

ISLAMIC REPUBLIC OF IRAN,

                                    Defendant.
-------------------------------------------------------------- X

STATE OF NEW YORK        )
                         : SS
COUNTY OF BRONX          )


        DYLAN SMITH, being duly sworn, deposes and says:

        1.      I am a plaintiff in the within action, am over 18 years of age, and reside at
190 Fordham Street Suite 2, Bronx, New York 10464.

        2.      I am currently 27 years old, having been born on May 13, 1996.

        3.      I am the son of Decedent, Daniel G. Smith, upon whose death my claim is
based, and submit this Affidavit in connection with the present motion for a default
judgment and in support of my solatium claim.

        4.      My father passed away from brain cancer on February 7, 2016, at the age of 63
years old. It was medically determined that this illness was causally connected to his exposure to
the toxins resulting from the September 11, 2001, terrorist attacks at the World Trade Center.

5.      My father worked as a union representative. We would always watch sports together, go to the games, travel, and just spend a lot of quality time with each other in general.

6.      I was too young on the day of 9/11 to recall what happened. All I can remember is that he worked for Castle Oil at the time.

7.      My father had developed brain cancer due to his exposure to the toxins resulting in the 9/11 attacks. My father would undergo chemotherapy treatments for his cancer, and he progressively lost cognitive function and could not communicate properly. My father could not walk without assistance, and he eventually became bed-ridden before passing away.

8.      When my father had passed, it was very hard to say goodbye. My father's death caused a rift amongst our family, and several of our family members are now estranged due to the passing of my father.

_____
DYLAN SMITH

Sworn before me this

**07** day of November, 2023

_____
Notary public

EVA I HIDALGO
Notary Public - State of New York
No. 01HI0003954
Qualified in Bronx County
My Commission Expires March 27, 2027